IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 31, 2021 Session

**STATE OF TENNESSEE v. DOUGLAS M. FERGUSON**

**Appeal from the Criminal Court for Sullivan County**
**No. S70,498      James F. Goodwin, Jr., Judge**

——————————————————————

**No. E2020-00400-CCA-R3-CD**

——————————————————————

The Sullivan County Grand Jury indicted Douglas M. Ferguson, Defendant, for attempted first degree premeditated murder in count one, aggravated assault in count two, and reckless endangerment in count three. Following a trial, the jury convicted Defendant of misdemeanor reckless endangerment in count one, aggravated assault in count two, and felony reckless endangerment in count three. The trial court merged counts one and three into count two, sentenced Defendant to five years in the Tennessee Department of Correction with a thirty percent release eligibility, and imposed a fine of $10,000. On appeal, Defendant argues that the trial court erred by denying alternative sentencing and by ordering Defendant to pay an excessive fine. Upon a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Patrick S. Rader and Brennan M. Wingerter, Assistant Public Defenders, Tennessee District Public Defenders Conference, Franklin, Tennessee, (on appeal), and Andrew J. Gibbons, District Public Defender, and Leslie A. Tiller, Assistant Public Defender, Blountville, Tennessee, (at trial) for the appellant, Douglas M. Ferguson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Barry P. Staubus, District Attorney General; and P. Michael Filetti and Michael B. Watson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural History

*Trial*

David Wade Ferguson ("the victim") testified that he lived on Highway 421 in Sullivan County with his wife, his son, and his son's fiancée. He said that Defendant was his father and his neighbor and that he and his father had been neighbors for twenty-seven years. The victim explained that he twice had surveys done on his property and Defendant's property but that Defendant did not agree with the surveys. The victim said that, on June 28, 2018, he was mowing his four- and one-half-acre lawn on a zero-turn, commercial riding lawn mower. He explained that a "zero-turn" mower does not have a steering wheel but instead is maneuvered using "levers" on each side of the mower. The victim said that, in order for the blades on the mower to engage, he had to have his seatbelt fastened.

The victim recalled that, when he got ready to mow the "driveway side," he asked his wife, Susan Ferguson, to "keep an eye on me." He said that Mrs. Ferguson stayed outside on the concrete patio while he mowed. The victim explained that the property line was delineated by "an old farm-woven fence" that was about twenty years old. The victim recalled that Defendant had cut an opening in the fence on Easter prior to the incident and that the opening was large enough for a man to walk through. He said that parts of the fence were overgrown with shrubbery. He recalled:

> So as I'm making my way up that, it's [] a bank, you know, from the [] driveway down to the fence, and it's kind of uphill too a little bit as you come up to the curve.
>
> As I was working my way up through there, I g[o]t to those large evergreens that have grown up through the fence and [] stick out. And as I got to that first evergreen, you have to kind of work your way around it. And when I started to work around that, an individual jumped out from behind that first evergreen with a chainsaw in his hand.

The victim testified that he recognized the person with the chainsaw as Defendant. He said that, because he had headphones on, he did not hear the chainsaw but that it scared him. He said that he tried to "scramble" away from Defendant, "jerk[ed]" the mower, got around Defendant, and returned to his driveway. The victim recalled that he tried to drive up the driveway to his house but that Defendant "was right there" with the chainsaw over his head, trying to "stick it in [his] face." He recalled that he saw the chainsaw running

with smoke coming out of it. The victim said that he tried to "slap" the chainsaw away with his right hand while he maneuvered the mower with his left hand. He explained:

> The lawn mower actually went right. [Defendant] was standing in front of it. And we both went back down the embankment to the fence. . . . He fell down and the lawn mower r[a]n over him. . . . [The chainsaw] landed [] in-between my legs, up under the lawn mower seat, still running. . . . I reversed the lawn mower off of him back onto the driveway and turned it off[.] I turned the chainsaw off.

The victim stated that, when the chainsaw fell onto the mower between his legs, it cut the back of his calf. He said that his son, Mr. Donovan Ferguson, called 911. He recalled that Defendant was asking for help but said that Defendant was "verbal and confrontational," so he did not approach Defendant.

On cross-examination, the victim explained that the property where he, his brother, and Defendant lived was fourteen acres; that he, his brother, his mother, and Defendant all purchased the land together in the 1980's; and that all four names were on the deed. He explained that, around 1992, "[w]e had a lawyer draw up what sections we wanted versus the acreage. That determined what each one of us had to pay for that property." The victim said that Defendant "doesn't always seem to remember" that the property was subdivided in 1992 and that, as a result, he and Defendant had a "fractured relationship."

The victim said that it was "common practice" for his family to watch out for him while he mowed the property due to several prior incidents with Defendant. He agreed that, when he mowed along the fence line, that "kind of set [Defendant] off." He agreed that he saw Defendant sitting in a chair outside when he began mowing along the fence line.

After reviewing his written statement to police, the victim agreed that the statement did not mention him trying to "slap" the chainsaw away from his face with his right hand while he maneuvered the mower with his left hand. He said that the entire incident lasted "about five seconds."

Susan Ferguson testified that the victim was her husband and that she lived on Highway 421 with him, their son, and their son's fiancée. She recalled that, on June 28, 2018, she and her son were on their concrete patio talking and that the victim was mowing the yard. Mrs. Ferguson said that she and her son were outside to "keep an eye on [Defendant]." She saw Defendant walk to his truck, pick up something that was next to his truck, put the item in the back of his truck, and drive down to where the victim was

mowing by the fence. Mrs. Ferguson started to approach her husband to tell him that Defendant was coming when she saw Defendant on their side of the fence. She explained:

> [Defendant] came out from behind the bushes with the chainsaw and a tree branch above his head. [The victim] went around him up onto the driveway. [Defendant] was chasing him [w]ielding the chainsaw down like he was chopping at him. . . .
>
> [The victim] had his hands up and was trying to hit at the chainsaw to knock it down. And they slid and went back over the bank. And then [the victim] backed up into the driveway and we could see that [Defendant] was injured.

Mrs. Ferguson said that she yelled to her son to call 911. She recalled that Defendant was still "combative, trying to get up, cussing, saying he was going to show us. That it was his land[.]"

Mrs. Ferguson recalled Easter Sunday 2018 when she and the victim had family over for Sunday dinner and an Easter egg hunt. She said that Defendant came over and cut a hole in the fence and said that he was going to use the driveway and "[t]hat it was his driveway." Mrs. Ferguson parked her vehicle in front of the opening Defendant created so that Defendant could not drive through.

On cross-examination, Mrs. Ferguson agreed that the fence Defendant cut belonged to Defendant.

Donovan Ferguson testified that Defendant was his grandfather and that he lived on Highway 421 with his parents and fiancée. He said that, on June 28, 2018, he was outside, loading his car to prepare for a trip. Mr. Donovan Ferguson[1] recalled that his mother asked him to watch the victim with her as he was mowing. He explained:

> So I turned around, and she started screaming, so I pulled out my phone. And I s[aw] [Defendant] behind the tree jump out in front of my dad on the mower. And my dad went up the hill onto the driveway. And [Defendant] chased him. And when my dad turned around, [Defendant] was right on top of him. And they run into the scuffle and went off the driveway back into the fence. And I immediately was -- I was already dialing 911 during the whole thing.

---

[1] Because several witnesses share the same last name with Defendant, we will use given names for clarity.

- 4 -

. . . .

[Defendant] had a chainsaw he was carrying and he threw [it] up above his head and chased dad. And when [Defendant] met him on the driveway, [the chainsaw] was above [Defendant's] head coming down at him.

Mr. Donovan Ferguson said that the victim tried to fight off the chainsaw at the same time he was trying to control the lawn mower. He recalled that the victim and Defendant "went off the bank" and that the mower ended up on top of Defendant. He said that the victim backed the mower up and parked it on the driveway. Mr. Donovan Ferguson said that he told the 911 dispatcher that he had no training to provide medical attention and that Defendant was still being aggressive.

On redirect examination, Mr. Donovan Ferguson said that, whenever he or the victim would mow, Defendant would "harass" them and would yell and shake his fist. He said, "[We] just never knew what he was going to do, if he was going to come through the fence or chase [us] with something. I mean, he's done everything. He's chased my mom while she was mowing[.]"

Sullivan County Sheriff's Office Detective Matt Harrison testified that he arrived at the scene on Highway 421 on June 28, 2018. When he arrived, Defendant was being prepared for transport to the hospital via helicopter. He said that he spoke with the victim, Mr. Donovan Ferguson, and Mrs. Ferguson. Detective Harrison stated that he collected the chainsaw and Defendant's shoes and socks as evidence.

On cross-examination, Detective Harrison said that he did not notice any injuries to the victim. He agreed that no injuries to the victim were documented in the file. He agreed that he had no swabs or any other evidence that the chainsaw hit the victim's leg.

Following deliberations, the jury convicted Defendant of misdemeanor reckless endangerment in count one with a fine of $2,500, aggravated assault in count two with a fine of $10,000, and felony reckless endangerment in count three with a fine of $3,000.

*Sentencing Hearing*

The parties agreed to proceed with a presentence report prepared on April 24, 2017, from Defendant's prior Sullivan County aggravated assault conviction against his neighbors, Ronald and Marilyn Rosenbalm, in Case No. 65388.

The victim testified that he never instigated altercations with Defendant; Defendant was always the instigator. He said that Defendant would yell at him and his family not to

- 5 -

"mow against [Defendant's] fence" because Defendant believed that he owned all of the property. The victim said that the incident had a "serious [e]ffect" on him and that he feared that his father would return home one day. He stated that he would not be happy with alternative sentencing because he feared retaliation from Defendant. He agreed that Defendant exhibited symptoms of confusion, dementia, and paranoia. The victim recalled that, in one year, his family made seventeen calls to 911 over Defendant's behavior, and in another year, there were thirty-three calls to 911. He said that the regular calls to 911 had been going on for ten to fifteen years.

Mrs. Ferguson testified that Defendant's threatening behavior gave her "almost a form of PTSD" and that, even though she knew that Defendant was not at his property, she was constantly "watching [her] back" whenever she mowed. She said that she would not feel safe if Defendant were ever let out of prison. She explained, "I feel like he still believes that he owns everything down there and I feel like he'll come back and try to take what he thinks is his. And I don't think he has any remorse for what he did at all." Mrs. Ferguson agreed that Defendant exhibited symptoms of confusion and dementia. She said that she did not believe that Defendant would obey a court order prohibiting him from coming onto their property.

Mr. Donovan Ferguson testified that Defendant had disputes with his parents "at the fence" for as long as he could remember, since he was a "small child." He said that he would not feel safe and that he would worry for his parents if Defendant was ever released from incarceration. Mr. Donovan Ferguson agreed that Defendant exhibited signs of confusion and dementia.

Neta Brooks testified that she was Mrs. Ferguson's mother and that she lived next door to the victim and Mrs. Ferguson. She recalled that Defendant "walk[ed] the fence line a lot and tr[ied] to get my attention to come over there. And he [] thought that he owned my house and my land." She recalled that she had to call the police when a tree fell over onto Defendant's property and that Defendant used abusive language with her and her grandsons about it. She recalled that she had to call police another time when Defendant came up her driveway yelling at her grandsons who were working on her kitchen sink. Ms. Brooks said that she was afraid that Defendant would be released from incarceration. She agreed that Defendant's confusion had progressively gotten worse over the prior two years.

Mr. Rosenbalm testified that Defendant's property adjoined his and that they had been neighbors for twenty-five years. Mr. Rosenbalm said that Defendant had "harassed" and "stalked" him for twenty-five years. He explained that, in 2009,[2] he was mowing when

---

[2] Mr. Rosenbalm testified that this incident occurred in 2010. However, the record on appeal indicates that the incident occurred in 2009, and Defendant's conviction for the incident was in 2010.

Defendant approached him and Mrs. Rosenbalm. Mr. Rosenbalm said, "[A]nd all of a sudden [Defendant] just punched her." He said that, following this 2009 assault, he and Defendant agreed to an order in sessions court for "no contact."

Mr. Rosenbalm testified that, in 2015, he was working on his fence when Defendant reached over the fence and "grabbed" him. He recalled that his wife tried to help get Defendant off of him and that Defendant grabbed her by the hair, "[s]lung her around and scratched her neck and all that." Mr. Rosenbalm said that he and his wife would not feel safe if Defendant were ever released from incarceration. He agreed that Defendant had not said anything to him or his wife since 2017 but said that Defendant would stand outside and watch them.

Marilyn Rosenbalm testified that she was Ronald Rosenbalm's wife. She said that she suffered a fractured nose and a "busted mouth" from Defendant's assault of her in 2009. She said that, due to his assault in 2015, she had scratches on her neck. Mrs. Rosenbalm stated that she would not feel safe if Defendant were released from incarceration. She agreed that Defendant's confusion has gotten worse over the years.

Defendant testified that he was seventy-six years old. He said that he had steady employment until his retirement. He recalled that his ex-wife, Helen Ferguson, divorced him in 2017, "on account of she was dying and I couldn't go back into the trailer on account the pro---whatever you want to call it---probation had me confined where I wasn't allowed to have a gun." He said that his ex-wife passed away the year prior to trial in the present case. Defendant said that he lost his leg due to the incident leading to his convictions in the present case.

Defendant said that the "paperwork" for the property showed that "the two boys" were "tenants in common." He said that he bought the property and that he never signed any papers to subdivide the land. Defendant stated that he owned the land where the victim and Mrs. Ferguson live, as well as the land where Ms. Brooks lives.

Defendant testified that he never "went after" the victim with a chainsaw. He said, "I went over there to saw my fence row out. . . . I was sawing the brush away between Neta Brooks's house and my property[, and] I got hit by a lawn mower." He said that he had thirty years' experience using a chainsaw with his prior employment. Defendant stated that, if he actually wanted to cause injuries to a person with a chainsaw, that person would have injuries.

Defendant testified that, if the court ordered him to live elsewhere and never contact any of his neighbors, he would abide by the court's order. He said that he would also sue in federal court to get his property back. Defendant stated that he had approached several

attorneys to attempt to sue the federal government over power poles that he believed killed his animals. Regarding his physical condition, Defendant said that, in addition to his amputated leg, he had two stents in his heart.

On cross-examination, Defendant said that he would return to his trailer and his property if the court permitted it. He said that his trailer was "ra[n]sacked" and that someone stole his guns. Defendant denied punching Mrs. Rosenbalm in 2009 and said that he was on his property when Mr. and Mrs. Rosenbalm "jumped on" him. Defendant denied grabbing Mr. or Mrs. Rosenbalm over the fence in 2015. Defendant said that the victim, Mrs. Ferguson, and Mr. Donovan Ferguson all lied when they said he attacked the victim with a chainsaw and chased him up the driveway.

Wayne Ferguson testified that Defendant was his father and the victim was his twin brother. He said that Defendant was "[o]bsessed with property lines and fences. Property is completely covered in fences, more fences than I've ever seen in my life, than anybody would ever have to fence." Mr. Wayne Ferguson stated that Defendant's late wife, Helen Ferguson, "took advantage of [Defendant]" and that she exacerbated his obsessions. He said that, if Defendant were released, Defendant could live in a residence on the property where Mr. Wayne Ferguson's late mother used to live, which was currently owned by Mr. Wayne Ferguson. He agreed that, if Defendant received alternative sentencing, he would help get Defendant to probation appointments and doctors' appointments. Mr. Wayne Ferguson said that he would do everything in his power to ensure that Defendant complied with any rules of the trial court. He stated that he tried to get Defendant "judicially evaluated" at "Bristol Regional" and that the doctors found nothing that would enable them to have Defendant "judicially committed." Mr. Wayne Ferguson explained that he removed the guns that were in Defendant's trailer and that the guns were currently in Mr. Wayne Ferguson's home.

On cross-examination, Mr. Wayne Ferguson agreed that he was the "liaison" between Defendant and the rest of the family. He said that, when he visited Defendant in jail, Defendant made no threats against the victim but only stated that he wanted to hire an attorney. Mr. Wayne Ferguson recalled that Defendant told him, "If you wanted to kill somebody, you wouldn't use a chainsaw."

During the argument, defense counsel discussed Defendant's mental health evaluation to determine whether Defendant was competent to stand trial and Defendant's mental state at the time of the crime. Defense counsel stated, "In this case he was sent for an evaluation by Frontier Health. Frontier Health was concerned enough to refer him to

Moccasin Bend. He was there a month at Moccasin Bend. Ultimately they did not find that he wasn't competent."[3]

The trial court stated that it

> considered the evidence presented at the trial, at this sentencing hearing; the presentence report that was filed in the previous case on April 24, 2017; principles of sentencing and arguments made of the sentencing alternatives; the nature and characteristics of the criminal conduct involved; the evidence and information offered by parties on mitigating and enhancing factors; any statistical information provided by the Administrative Office of the Courts of the sentencing practices for similar offenses in Tennessee located at www.tncourts.gov; and the testimony of the Defendant here today on his own behalf about sentencing; and the Defendant's potential for rehabilitation or treatment.

The trial court stated that Defendant was a Range I standard offender. It noted that Defendant had a prior misdemeanor assault conviction from an incident in 2009 and a prior aggravated assault conviction in 2017 and that Defendant received alternative sentencing for both convictions. Based on Defendant's prior criminal history, the trial court applied enhancement factor (1), that Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. The trial court also applied enhancement factor (8), that Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and factor (13), that Defendant was on probation at the time of the current offense, because the current offense occurred while Defendant was on probation for the 2017 aggravated assault conviction. The trial court stated that Defendant "threatened his son with a chainsaw" and that it "can't even wrap [its] mind around how a father could do that to [his] son." Thus, the trial court applied enhancement factor (10), stating that Defendant "had no hesitation about committing a crime where the risk to human life was high."

Considering mitigating factors, the trial court declined to apply factor (1), that Defendant's criminal conduct neither caused nor threatened serious bodily injury, stating that Defendant clearly threatened serious bodily injury with a chainsaw. It also declined to apply factor (3), stating that "the fact that he has it in his head, for whatever reason, that he owns all that property, and has believed that for 25 years when clearly he does not own that property, does not constitute, in my opinion, substantial grounds tending to excuse his conduct." However, the trial court did apply factor (6), that Defendant, because of youth or old age, lacked substantial judgment in committing the offense and factor (8), that

---

[3] There is no official report from Moccasin Bend in the record on appeal.

Defendant was suffering from a mental or physical condition that significantly reduced Defendant's culpability for the offense. It gave mitigating factors (6) and (8) "a small amount of weight[,]" stating, "I don't think that his confusion and the fact that he -- he's a little more confused now than he was before, is a substantial lack of judgment or a significant reduction in his culpability for this offense." Finally, it applied factor (13), "any other factor consistent with the purposes of this chapter[,]" based on Defendant's work history, and said it would give Defendant "full credit for the fact that he [] worked all his life to retirement age."

The trial court merged counts one and three into Defendant's conviction for aggravated assault in count two, and it merged the fines imposed by the jury into one $10,000 fine. It sentenced Defendant to five years.

The trial court then considered alternative sentencing, taking into account Defendant's presentence report "in its entirety[,]" his prior criminal history, his confusion, and his social history. In denying alternative sentencing, it stated:

> What worries me about his prior criminal history is: #1) it's all violent; and #2) it all stems from that piece of property. He is so fixated on that piece of property that he can't see anything else.
>
> Because of his fixation on his property and [] his overwhelming belief that he owns the property, based on the facts and circumstances of this offense, . . . [b]ased on the proof before me, I do not reasonably expect that [Defendant] would stay away from that property, no matter no matter how many times I told him to. The Rosenbalms testified today that even though he wouldn't talk or communicate with them, that even after -- while he's been on probation, he's continued to stand at the fence and watch them. And the [c]ourt's of the opinion that's a form of contact.
>
> And then what did [Defendant] do when he couldn't fixate on the Rosenbalms and that fence on that side of the property, he went to the other side of the property and fixated on his son. And the [c]ourt's concerned that if I put him on supervised probation, he's going to go to another side of the property and either fixate on Ms. Brooks or whoever owns the property behind him.

- 10 -

The trial court ordered Defendant to serve his five-year sentence in the Tennessee Department of Correction, with a thirty percent release eligibility, consecutive to his sentence in the 2017 aggravated assault conviction.[4]

*Motion for New Trial and Resentencing Hearing*

Defendant filed a motion for new trial and two amended motions for new trial, arguing, in part, that Defendant was not statutorily required to serve his sentence in the present case consecutive to his sentence for his 2017 aggravated assault conviction. The court granted a hearing on the consecutive sentencing issue. After reviewing the consecutive sentencing factors, the trial court determined that Defendant's conviction in the present case would be served concurrently with his sentence in the 2017 aggravated assault case.

Defendant now timely appeals.

## Analysis

*Alternative Sentencing*

Defendant argues that the trial court erred in denying alternative sentencing because it failed to consider Defendant's risk and needs assessment as required by statute. He also asserts that the trial court "ignored one of the purposes of sentencing" by failing to acknowledge that he was a favorable candidate for alternative sentencing. Finally, Defendant contends that the trial court "erroneously assessed the proof" when it "determined that [Defendant] could not be rehabilitated, would not abide by the trial court's orders, and would return to his property and cause more trouble with his neighbors."

The State responds that the trial court's decision was presumptively reasonable and that it acted within its discretion in denying alternative sentencing.

When a trial court denies probation or any other alternative sentence to an eligible defendant and states on the record reasons that are in accordance with the purposes and principles of sentencing, the court's decision is reviewed under an abuse of discretion standard, accompanied by a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If the trial court fails to articulate the reasons for denying an alternative sentence, the "abuse of

---

[4] Additionally, the trial court found Defendant guilty of violating his probation in the 2017 aggravated assault case, Case No. 65388. It revoked Defendant's probation on the 2017 conviction and ordered Defendant to serve five years in the Tennessee Department of Correction, with credit for time served.

- 11 -

discretion standard with a presumption of reasonableness" does not apply on appeal and an appellate court can either (1) conduct a de novo review to determine whether there is an adequate basis for denying probation; or (2) remand for the trial court to consider the requisite factors in determining whether to grant probation. *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013).

In determining whether confinement is appropriate, the trial court should consider the following principles:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C) (2019). "A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less," with some exceptions. *See* Tenn. Code Ann. § 40-35-303(a) (2019).

A defendant has "the burden of establishing suitability for probation[.]" Tenn. Code Ann. § 40-35-303(b) (2019). Probation is "a privilege" or "an act of grace" which may be granted to an accused who is eligible and "worthy of this largesse." *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). In *State v. Trent*, our supreme court stated:

> [T]he guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion. Those factors include (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value.

*State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

Here, because Defendant received a sentence of ten years or less, he was eligible for probation. Tenn. Code Ann. § 40-35-303(a) (2019). The trial court considered Defendant's presentence report "in its entirety[,]" his prior criminal history, his

"confusion," and his social history. The trial court went into detail regarding Defendant's inability to abide by the court's prior instructions by committing this offense within approximately one year of his 2017 aggravated assault conviction and while he was on probation for his 2017 conviction, showing that measures less restrictive than confinement were recently applied unsuccessfully to Defendant. *See* Tenn. Code Ann. § 40-35-103(1)(C) (2019). The trial court noted Defendant's obsession with property lines and his continued prohibited contact with his prior victims, and it explained how confinement would be necessary to restrain Defendant to protect his neighbors. *See* Tenn. Code Ann. § 40-35-103(1)(A) (2019). Because the trial court stated on the record reasons in accordance with the purposes and principles of sentencing, we will review the court's decision under an abuse of discretion standard with a presumption of reasonableness. *Caudle*, 388 S.W.3d at 278-79; *Bise*, 380 S.W.3d at 707. "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Here, the trial court noted that Defendant continued to "watch" or "stalk" the Rosenbalms despite the trial court's instructions to him not to contact them, in addition to his attacking his son while on probation, which showed that Defendant was not amenable to correction. *See Trent*, 533 S.W.3d at 291. Regarding the circumstances of the offense, the trial court noted that it could not "wrap [its] head around" a father assaulting his son with a chainsaw and stated that there was increased danger because Defendant was "obsessed" with "that piece of property." *See id*. The trial court also stated that Defendant's criminal history was "all violent." *See id*. It did not specify any concerns about Defendant's social history, only that it considered his social history. *See id*. However, it is clear from the record that Defendant has strained relationships with his entire family except one son and that several of his neighbors live in fear of his ever being released. Regarding Defendant's mental and physical condition, it is clear from the record that Defendant's physical condition is poor -- he lost a leg during the course of the offense. Moreover, several witnesses testified to Defendant's "confusion," and the trial court determined that his confusion was a mitigating factor.

The trial court did not apply an incorrect legal standard or reach a conclusion that was illogical or unreasonable; thus, the trial court did not abuse its discretion in denying alternative sentencing.

Citing *State v. Christopher C. Solomon*, Defendant argues that, because the trial court did not consider his "risks and needs assessment" showing a low risk of reoffending, the trial court failed to consider the "purposes and principles of sentencing." No. M2018-00456-CCA-R3-CD, 2018 WL 5279369, at *7 (Tenn. Crim. App. Oct. 23, 2018) ("Section 40-35-210(b) lists the risk and needs assessment as one of the sources that trial court *must*

*consider* in determining a defendant's sentence." (emphasis added.)) Thus, he argues that the trial court's decision should not be analyzed under the abuse of discretion standard with a presumption of reasonableness and that its denial of alternative sentencing was error. However, the trial court in the present case noted that it "considered the presentence report in its entirety." Because the presentence report included the risk and needs assessment, the trial court considered Defendant's risk and needs assessment in its decision. *See State v. Cynthia P. Nance*, No. W2019-01566-CCA-R3-CD, 2021 WL 1699316, at *6 (Tenn. Crim. App. Jan. 27, 2021) (concluding that the trial court considered the risk and needs assessment because "the trial court stated on the record that it was considering the presentence report, which included the risk and needs assessment"). Moreover, "the record reflects that the trial court extensively considered [D]efendant's potential for rehabilitation and his amenability to correction in its sentencing determination." *State v. Ronald Ailey*, No. E2017-02359-CCA-R3-CD, 2019 WL 3917557, at *31 (Tenn. Crim. App. Aug. 19, 2019). Finally, we note that the risk and needs assessment Defendant relies on was prepared for his 2017 aggravated assault conviction, for which he received probation. Although this 2017 assessment states that Defendant has a low risk of reoffending, it was prepared before Defendant reoffended in the present case and violated his probation. This argument is unavailing.

Defendant also argues that the trial court erroneously concluded that his mental health deterioration was insignificant and that this conclusion "completely contradicted the evidence presented at trial and the sentencing hearing." However, at the sentencing hearing, Mr. Wayne Ferguson testified that he had Defendant "judicially evaluated" at "Bristol Regional" and that the evaluators found nothing that would enable them to have Defendant "judicially committed." Moreover, the pretrial order to have Defendant evaluated for competency to stand trial and for his mental state at the time of the crime resulted in Frontier Health reporting to the trial court: "After completion of this assessment, including multiple sessions, these evaluators cannot make a determination of [D]efendant's competency to stand trial or determine his mental condition at the time of the alleged offense on an outpatient basis." Defense counsel conceded at the sentencing hearing that a subsequent inpatient evaluation at "Moccasin Bend" found Defendant competent to stand trial. Thus, there is no evidence upon which the trial court should have relied that Defendant was suffering from dementia or had any diagnosed medical condition which would mitigate his actions, and the argument of counsel that Defendant "clearly ha[d] a mental problem" was not evidence. *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). The trial court acknowledged the testimony of several witnesses regarding Defendant's "confusion" but determined that was insufficient to significantly reduce Defendant's culpability for the offense. *See State v. Curtis Allen White*, No. M2013-01422-CCA-R3-CD, 2014 WL 296011, at *3 (Tenn. Crim. App. Jan. 28, 2014) (concluding that the trial court did not abuse its discretion in denying alternative sentencing, even though

the trial court found that the defendant "probably had 'some pretty bad mental problems' but that did not "make him any less dangerous'"). This issue is without merit.

*Fine of $10,000*

Defendant argues that the trial court erred in imposing the fine of $10,000 found by the jury because the trial court did not conduct an "independent review" of Defendant's ability to pay the fine. The State responds that the trial court did not abuse its discretion in imposing the fine.

"This court reviews fines as a part of the sentence, and our standard of review is abuse of discretion[.]" *State v. Ruby W. Graham*, No. M2012-00674-CCA-R3-CD, 2013 WL 2311049, at *5 (Tenn. Crim. App. May 28, 2013) (internal citations omitted).

> In a case where the range of punishment includes a fine in excess of fifty dollars ($50.00), the jury finding the defendant guilty shall also fix the fine, if any, in excess of fifty dollars ($50.00). The jury shall report such fine with a verdict of guilty. When imposing sentence, after the sentencing hearing, the court shall impose a fine, if any, not to exceed the fine fixed by the jury.

Tenn. Code Ann. § 40-35-301(b) (2019). "[T]he trial judge has the power to impose any fine which does not exceed the fine fixed by the jury, and to reduce, suspend, or release fines." *State v. Bryant*, 805 S.W.2d 762, 765 (Tenn. 1991) (citing Tenn. Code Ann. §§ 40-24-101, -102, and -104). A trial court "may not simply impose the fine as fixed by the jury" but must consider "the factors and principles of the 1989 Sentencing Act, such as, prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors, that are relevant to an appropriate, total sentence." *See State v. Blevins*, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997); *see also State v. Jadarius Sankevious Foster*, No. W2020-00349-CCA-R3-CD, 2021 WL 1158156, at *14 (Tenn. Crim. App. Mar. 26, 2021) (quoting *Bryant*, 805 S.W.2d at 765-66) ("In imposing a fine, the trial court must consider the principles of sentencing, including 'prior offenses, potential for rehabilitation, mitigating and aggravating circumstances, and other matters relevant to an appropriate sentence.'") A defendant's ability to pay is a factor in the establishment of fines. Tenn. Code Ann. § 40-35-207(a)(7) (2019). A defendant bears the burden to establish why the imposed fine is excessive. *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). The maximum fine for a Class C felony is $10,000. Tenn. Code Ann. § 40-35-111(b)(3) (2019).

Initially, we note that Defendant "never raised an objection regarding his fines, never presented any proof regarding his ability to pay fines, and never argued that the trial court should refrain from imposing the fines fixed by the jury for any reason[;]" thus, he

- 15 -

"risked waiver of this issue." *See Jadarius Sankevious Foster*, 2021 WL 1158156, at *14; Tenn. R. App. P. 36(a). Nevertheless, we will briefly address Defendant's claims.

It is apparent from the record that Defendant qualified as indigent. "A declaration of indigency, standing alone, does not, however, immunize [D]efendant from fines." *Alvarado*, 961 S.W.2d at 153. "It is merely one factor which may be taken into account." *Id.* The presentence report shows that Defendant draws monthly social security in the amount of $1,400, monthly "retirement income" in an unstated amount, and that he has owned real estate since 1987. Defendant presented no evidence of his inability to pay the fines imposed by the jury, made no objection to the imposition of the fine, did not raise the issue in his motion for new trial, and did not argue the issue in the motion for new trial hearing. We cannot conclude that the trial court abused its discretion in imposing the fine recommended by the jury in the amount of $10,000. *See e.g.*, *State v. Dewayne Jones*, No. W2016-00074-CCA-R3-CD, 2017 WL 2998900, at *8 (Tenn. Crim. App. July 14, 2017), *perm. app. denied* (Tenn. Oct. 6, 2017); *State v. Anthony Xen Maples*, No. E2013-00961-CCA-R3-CD, 2014 WL 1056671, at *5 (Tenn. Crim. App. Mar. 18, 2014). Defendant is not entitled to relief.

## Conclusion

The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE